**TEXAS EMPLOYERS' INSURANCE ASSOCIATION, Appellant,**

v.

**Andres ARABIE, Appellee.**

No. 4994.

Court of Civil Appeals of Texas.

Beaumont.

March 24, 1955.

Rehearing Denied April 13, 1955.

Keith, Mehaffy & McNicholas, Beaumont, for appellant.

E. B. Cochran, Port Neches, W. T. McNeill, Beaumont, for appellee.

PER CURIAM.

The appellee, Andres Arabie, instituted this suit June 13, 1952, to set aside a compromise settlement agreement he and appellant entered into March 12, 1952, with reference to a claim appellee was asserting under the Workmen's Compensation Law, Art. 8306 et seq., V.T.C.S. The agreement was approved by the Industrial Accident Board April 25, 1952. During pendency of the suit, to wit, on March 27, 1953, appellee petitioned the Industrial Accident Board to vacate its order of April 25, 1952, approving the compromise settlement agreement and to set his claim for hearing on its merits. Under date of April 8, 1953, the Board advised appellee by letter that it considered the matter closed. Thereupon and within twenty days after April 8, appellee notified the Board that he was unwilling to abide by its order refusing to set aside its earlier order of approval and would appeal therefrom by filing suit in a court of competent jurisdiction. Then, on April 30, 1953, which was within twenty days of the date of which the notice last above mentioned was given, he filed herein his second amended original petition on which he went to trial. In this petition, in addition to pleading the matters on which he relied for cancellation of the compromise settlement agreement, appellee, as if appealing from a final award of the Industrial Accident Board, and apparently treating the Board's letter of April 8, 1953, as such an award, pleaded as for recovery of compensation benefits, alleged that his injuries had resulted in his total permanent incapacity, and prayed accordingly.

He predicated his right to have the compromise settlement agreement set aside upon two distinct theories: (1) the theory that he was induced by legal fraud to enter into the agreement; (2) the theory that he withdrew from the compromise settlement agreement before the order of the Industrial Accident Board approving it became final and therefore at a time when he was at liberty to withdraw from it at will. In this latter connection, he took the position that a telegram from one of his attorneys, in which the Board was requested not to approve the agreement, was received by the Board both before the close of business on the day the compromise settlement agreement was approved and before the Board's letter of approval had been mailed, and therefore before the order of approval had become final under the Board's Rule 14, which is as follows: "The Board's approval of a compromise settlement agreement, properly executed, shall be final unless a request not to approve same has been received by the Board before the close of business of the day on which same has been approved; provided, however, if the Board's letter of approval of such compromise settlement agreement has been mailed before such request not to approve has been received, the Board's approval in such case shall be final."

As constituting fraud, appellee pleaded that the extent of his injuries was misrepresented to him by a Mr. Haney, identified as the defendant's claim representative, and by Dr. Thomas Matlock, who had treated him on behalf of the defendant. Haney was alleged to have told him at the time the agreement was entered into that the "medical reports from the company doctors were all negative and that he [Arabie] had no injury of any consequence." Dr. Matlock was alleged to have told him shortly before the agreement was entered into that he [Arabie] had no injury of consequence but merely a minor sprain of his back which would amount to nothing, and that his trouble would clear up and he would be all right within a short while.

The case was submitted to a jury on twelve special issues, all pertaining to ap-

pellee's right to have the compromise settlement agreement set aside. In response to the first five of these (1, 2, 3–A, 4), the jury found that during the first part of March, 1952, Dr. Matlock told plaintiff his injury was of no consequence and would clear up within a short time; that such statement was untrue; that at the time of entering into the compromise settlement agreement plaintiff believed the statement; that in making the agreement plaintiff relied on the statement; and that the statement was a material inducement to plaintiff in making the compromise settlement. In response to four of the succeeding five questions (5, 7, 7–A, 8), the jury found that "on or about March 12, 1952, Mr. Haney stated to plaintiff that based on the medical report of Dr. Glass that he had no injury of any consequence"; that plaintiff believed such statement; that in making the compromise settlement plaintiff relied on the statement; and that such statement was a material inducement to plaintiff in making the compromise settlement. However, by a negative answer in response to special issue No. 6, the jury failed to find from a preponderance of the evidence that the statement which it found Haney made to plaintiff was untrue. The jury was unable to reach an agreement on special issue No. 9 and left it unanswered, the issue being as follows: "Do you find from a preponderance of the evidence that plaintiff received a serious accidental injury to his back on or about January 23, 1952?" In response to the only other issue submitted to it (issue No. 10), the jury found that the telegram in which the Industrial Accident Board was requested not to approve the compromise settlement agreement was received by the Board before the latter's letter of approval was mailed.

On the jury's verdict, judgment was rendered in favor of the plaintiff to the extent that the compromise settlement agreement was declared set aside and cancelled, and all orders of the Industrial Accident Board pertaining to it were declared vacated. Plaintiff's suit for compensation benefits was declared dismissed, presumably for want of jurisdiction; but since no complaint is made of the judgment in this respect, that phase of the case is only incidentally involved on appeal.

The appellee in effect concedes that since the jury failed to find that the representations made by Haney were false the judgment was not predicated upon and is not supported by the remaining findings made with reference to those representations. As a consequence, we have disregarded those findings and the evidence bearing on them and have proceeded upon the theory that if the judgment is to be upheld it must find support either in the evidence and findings with reference to Dr. Matlock's representations or in the evidence and findings with reference to appellee's attempt to withdraw from the compromise settlement agreement on the day it was approved.

The appellant takes the position that there was no evidence to show that the plaintiff relied upon any false statement made by Dr. Matlock or that he was thereby induced to enter into the compromise settlement agreement, and contends that the evidence affirmatively shows that plaintiff relied upon the advice of a physician of his own choice, Dr. Tritico, to whom he went for treatment after he was discharged by Dr. Matlock. This contention was made in the trial court by motion for instructed verdict, and that court's action in overruling the motion is assigned as error in appellant's first point. It is necessary, therefore, that we set out the evidence which is thought to bear on the subject, and we shall do so by summarizing it in part and by quoting it in part.

The plaintiff, a carpenter, injured his back January 23, 1952, when he undertook to lift a heavy form. He finished the day's work and did not report his injury to his employer until the following morning. When he did report it, he was referred to Dr. Matlock for examination and treatment. He went to see Dr. Matlock either that day or the next and was subsequently treated by him or under his direction on some twelve occasions. Dr. Matlock testified that he last saw the plaintiff on February 16, 1952. During the time he was

attending him, Dr. Matlock referred plaintiff to a Dr. Kuhlman for X-ray study and to a Dr. Glass, an orthopedic surgeon, but it does not appear that either of these doctors ever communicated his findings and conclusions directly to the plaintiff; both made their reports to Dr. Matlock. The latter testified that he diagnosed plaintiff's injury as a strained muscle or sprained back, and so informed him. He said he also told plaintiff that he (the plaintiff) had a congenital abnormality together with chronic arthritis, but that the X-rays disclosed no fractured or dislocated bones. The plaintiff himself testified that after Dr. Matlock had made his initial examination the doctor told him that "the x-rays did not show any broken bones and all he could see was just rheumatism and stuff like that." Dr. Matlock testified that on February 16, 1952, the acute stage of plaintiff's injury having been overcome, he discharged plaintiff and recommended that he return to work. He said that at the time he neither represented to plaintiff that he was fully recovered nor made any prophecy as to when he would be, but was of the opinion that exercise would be beneficial. The plaintiff's testimony with reference to what Dr. Matlock told him during their last consultation follows:

"Q. What did Dr. Matlock tell you about your injuries the last time you went to him? A. He told me he couldn't find anything I had, so he just felt I could go back to work.

"Q. He said you were all right? A. Yes, sir."

It appears that within two or three days after his last consultation with Dr. Matlock the plaintiff did go back to work, but because his back still pained him he worked only about three hours. Then, on February 19, 1952, he went to his family physician Dr. Tritico, for treatment. Dr. Tritico testified to an earlier visit by the plaintiff but said that upon that occasion he merely directed plaintiff to return to Dr. Matlock and to continue the latter's treatment. He examined plaintiff on February 10, saw him again the following day, recommended a

course of treatments, and then talked to plaintiff's wife a number of times by telephone with reference to plaintiff's condition. He testified that his examination of plaintiff disclosed nothing more than a mild lumbo-sacral strain, exaggerated by nervousness or nervous tension, and that he told plaintiff he (the plaintiff) had mild muscle sprain. He said he also told both the plaintiff and plaintiff's wife that plaintiff had sustained no serious injury to his back, that his trouble was due more to nervousness than to anything else. In making his diagnosis, Dr. Tritico, according to his further testimony, had the benefit of Dr. Kuhlman's X-ray findings.

The plaintiff's version of what Dr. Tritico told him was as follows:

"Q. What did Dr. Tritico tell you? A. Well, he give me an examination and then told me that he couldn't tell me what I had unless he got an x-ray.

"Q. Did you go ahead and get an x-ray? A. No, sir.

"Q. Why didn't you? A. I couldn't pay the x-ray, so I didn't go.

"Q. Did he tell you that he couldn't find anything serious wrong with you? A. That is what he told me, he couldn't find anything unless he got an x-ray to * * *.

"Q. Did he tell you with the x-ray he couldn't find anything serious with you? A. No, sir.

"Q. Tell us the best you can exactly what Dr. Tritico told you. A. He told me my nerves were shot and to give me treatment he would have to have an x-ray, so I didn't get an x-ray."

On February 28, 1952, plaintiff again returned to work, and it appears that he then worked daily until he was laid off or discharged on the day following that on which he entered into the compromise settlement agreement. During such period, according to his testimony, his back continued to bother him to an extent that he was unable to discharge some of his duties.

The plaintiff's testimony being somewhat uncertain with reference to his attitude toward the advice given him by Dr. Matlock, we quote it:

### Direct Examination

"Q. Now tell us, Mr. Arabie, what caused you to sign those papers [compromise settlement agreement]? A. Well, the doctor had told me that I didn't have nothing to amount to anything, and I just thought maybe he was right.

"Q. You believed what he said? A. I did at that time, yes.

"Q. You relied on what he said? A. Yes, sir.

"Q. You relied on what Mr. Haney told you about it? A. Yes, sir.

"Q. Would you have signed those papers at that time if you hadn't believed they were telling you the correct dope, the correct information? A. No, sir, I wouldn't have signed them * * *.

"Q. You signed that instrument? A. Yes, sir.

"Q. At the time believing what the doctor and Mr. Haney told you? A. Yes."

### Cross Examination

"Q. Now after the last time that you saw Dr. Matlock, you saw Dr. Tritico? A. Yes, sir.

"Q. Why did you go to see Dr. Tritico? A. Because I wasn't so sure about Dr. Matlock.

"Q. What made you not rely on Dr. Matlock? A. Because I was still feeling pain in my back.

"Q. You mean that you didn't rely on what Dr. Matlock told you? A. No.

"Q. You felt that * * * did you feel that just because Dr. Matlock was the company doctor, you couldn't rely on him? A. No. sir, I just felt that any doctor can make a mistake.

"Q. In other words, you said to yourself, 'any doctor can make a mistake and I just don't want to rely on Dr. Matlock'? A. That is right.

"Q. And you didn't rely on Dr. Matlock, but went to Dr. Tritico instead? A. Yes, sir.

"Q. Of course, if you had relied on Dr. Matlock, you would not have gone to Dr. Tritico, you would have accepted what Dr. Matlock said? A. Yes, sir.

"Q. But you said that the reason that you didn't rely on Dr. Matlock was because you were still hurting? A. Yes, sir.

"Q. And that even though the doctor had told you that he couldn't see any broken bones, you said to yourself, 'I am not going to rely on that doctor,' is that right? A. That is right.

"Q. And therefore you went to see a doctor of your own selection? A. Yes, sir.

"Q. That you did have confidence in? A. Yes, sir.

"Q. And that you did rely on? A. Yes, sir.

"Q. Had you ever seen Dr. Matlock before this accident? A. No, sir.

"Q. Then I gather that the reason you did not rely on what Dr. Matlock told you was because you didn't know him and you did know Dr. Tritico, is that right? A. No, it ain't exactly right.

"Q. Well, what was the reason? A. Because I didn't rely on Dr. Matlock?

"Q. Yes. A. Because his treatment didn't do me any good.

"Q. Did you rely on him at all? A. Well, I made his treatment.

"Q. But when you got through with him, did you rely on anything that he said or did you just say, 'His treatment hasn't done me any good and I am going to see somebody else'? A. Well, I had gone to see somebody else.

"Q. What was your feeling about Dr. Matlock? A. He didn't do me any good.

"Q. What was your feeling about relying on him, did you rely on him in the slightest bit? A. No, sir.

"Q. Do you recall what it was that Mr. Haney said, the exact language that he used? Was it not substantially the same words that Dr. Matlock had used? A. Yes, just about the same words.

"Q. In other words, Mr. Haney didn't tell you anything different? A. No.

"Q. He told you that the doctor says * * * A. That is right.

"Q. That there are no broken bones and it is just rheumatism and stuff like that, is that right? A. Yes, sir.

"Q. You assumed that he was talking about Dr. Matlock? A. Yes, sir. Well, he told me he was, he told me he had talked to him.

"Q. In other words, he was quoting what Dr. Matlock had already told you? A. Yes, sir.

"Q. He didn't give you any new information? A. No, sir.

"Q. He just told you what you had already been advised by Dr. Matlock? A. Yes, sir. [At this juncture the plaintiff was asked, "What did Dr. Tritico tell you?" and there followed the series of questions and answers which have already been set out earlier in this opinion].

"Q. Did you rely on what Dr. Tritico told you? A. I guess I have to.

"Q. Let's see if I get it absolutely straight, and please correct me if I am wrong. You went to see Dr. Matlock first, the company sent you to Dr. Matlock? A. Yes, sir.

"Q. At the time Dr. Matlock got through treating you, you were still hurting, is that right? A. Yes, sir.

"Q. And because of the fact that you were still hurting, and because of the fact that you had not known Dr. Matlock before, you did not rely on what he told you, is that right? A. Yes, sir.

"Q. And Mr. Haney never told you anything different than what Dr. Matlock had already told you? A. No, sir.

"Q. And, of course, you did not rely on what Mr. Haney quoted Dr. Matlock as saying, any more than you did what Dr. Matlock had told you? A. No, sir.

"Q. That is right, isn't it? A. Yes, sir.

"Q. And you were unwilling to rely on what Dr. Matlock said or what somebody said Dr. Matlock said? A. No, nobody said nothing about Dr. Matlock.

"Q. Mr. Haney did later on? A. Yes, he did, what Dr. Matlock said.

"Q. But you didn't rely on Haney any more than you did Dr. Matlock? He was telling you the same thing, wasn't he? A. Yes, sir.

"Q. And you didn't rely on his statement of what Dr. Matlock said any more than what Dr. Matlock had told you personally? A. Yes, sir.

"Q. Is that right? A. That is right, yes, sir.

"Q. Mr. Arabie, is there anything in the questions I have asked you this morning that you haven't understood? A. I understand all of it.

"Q. There is no question about your understanding what I have been saying and what we have been going over for the past few minutes? A. No, sir."

### Re-Direct Examination

"Q. Mr. Arabie, did you change your opinion about what Dr. Matlock told you after you had talked to Tritico? A. Yes, sir.

"Q. Then what was that change? Did you believe then what he had told you? A. Yes, sir, I did.

"Q. Was that after you had changed your mind about it and relied on what Dr. Matlock had told you? [An objection by defense counsel was sustained.]

"Q. When you signed this settlement agreement with Mr. Haney, did you rely on what Dr. Matlock had told you about your back not amounting to anything, or not? A. No, sir, I didn't rely on it."

An objection was interposed by defense counsel to the last question, but the question was answered before the objection was ruled on and the objection was withdrawn.

■ Under its first point, appellant contends not only that there was no evidence to show that appellee relied upon Dr. Matlock's statements and was induced by them to enter into the compromise settlement agreement, but that the evidence affirmatively shows that appellee relied upon the advice of a doctor of his own choice, Dr. Tritico, to whom he went for treatment after having been discharged by Dr. Matlock. These contentions appear to be based upon both the theory that the evidence itself conclusively establishes that appellee relied altogether upon the advice of Dr. Tritico, and the theory that as a matter of law, he having consulted a doctor of his own choice and having been treated by him after being discharged by Dr. Matlock, appellee is not entitled to claim effectively that he relied upon Dr. Matlock's statements and was induced by them to enter into the compromise settlement agreement. Upon these theories, appellant specifically charges in its first point that the trial court erred in overruling its motion for an instructed verdict and in submitting to the jury the two special issues in response to which the jury found that appellee did rely on Dr. Matlock's statements and that such statements materially affected his decision. Plaintiff's last testimony on the matter, in answer to his attorney's question on re-direct examination, was as quoted above that he did not rely on what Dr. Matlock had told him about his back when he signed the settlement agreement. It seems to us that plaintiff's testimony negatives the idea of reliance on Dr.

Matlock's statement to him. However, even if the trial court had agreed with the contention of the appellant that there was no evidence which warranted the submission to the jury of the issues involving such representations and reliance thereon, its motion for instructed verdict on such ground was not improperly overruled. The appellee might still have prevailed in the trial court under his contention that the Industrial Accident Board had improperly approved the compromise settlement. We think the trial court was in error in submitting to the jury the issues involving fraudulent representations and reliance thereon, but we cannot render judgment in favor of appellant for the reasons hereinafter set out.

■ It appears to us that before this case can be finally decided, it must appear from the record that appellee was in the trial court with the kind of lawsuit he alleged that he had. He sued to set aside a compromise settlement approved by the Industrial Accident Board. He alleged that such approval by the Industrial Accident Board was erroneous; that it was done on the same day that he notified the Board by wire that he would not go forward with such settlement. He also sues to cancel and set aside such settlement agreement on the ground of false representations to him and his reliance thereon. He also sues to set aside the action of the Board in refusing his request to set aside this approval of settlement, and alleges a case against the appellant, the insurance carrier of his employer, for benefits under the Workmen's Compensation Law. Obviously, he was not in position to seek both these remedies in this proceeding. The Board's refusal to set aside the agreement and reopen the claim was not such a final award by the board as can be appealed from. See Commercial Casualty Co. v. Hilton, 126 Tex. 497, 87 S. W.2d 1081. The trial court recognized this and confined plaintiff in its judgment only to the question of cancellation and rescission of his compromise settlement, and to whether the Board had improperly approved the settlement agreement.

The appellee introduced some evidence in regard to his notice to the Industrial Accident Board that he was withdrawing from the settlement. On this he secured a jury finding that the Board received his attorney's telegram before the letter of approval of the settlement was mailed by the Board. If this finding is supported by sufficient evidence, then appellee's claim for compensation is still before the Industrial Accident Board, without any final award ever having been made. This would be true whether or not the settlement agreement should be set aside because of reliance on fraudulent representations. If the jury's verdict on this issue had been "no", then he had a suit for cancellation, and rescission before the trial court, which was to be determined on the issues of fraudulent representations, reliance thereon and injury occasioned thereby.

The evidence as to whether the appellee's telegram was received before the Board mailed the letter of approval is not sufficient to support this finding. The facts are obviously not fully developed. No one from the office of the Board was called to testify about the matter. The evidence is that the telegram arrived on the same date as the order of approval; that the letters of the Board written later say nothing about the telegram being received too late, and that such later letters refer to the fact that Mr. McNeill, who signed the telegram, was not recognized by the Board as attorney for plaintiff, since Mr. Cochran's name appeared on the Board's records as plaintiff's attorney. There was evidence that the plaintiff and Mr. Cochran, his attorney, received the notice of approval from the Board some three days and more after April 25, the date of the approval. There was evidence that ordinarily a letter mailed in Austin is received in Port Neches or Port Arthur the following day. All this is just enough to make it uncertain whether the Board received the telegram before it mailed the letter of approval or not. This requires reversal of the judgment and a remand of the case.

If this issue is fully developed on another trial and it is found that the Board erroneously approved the compromise settlement, then the plaintiff's claim for compensation is still before the Board. If it be decided that the Board properly approved the settlement agreement, then the plaintiff will be properly in court on his suit for cancellation and rescission of the settlement agreement. If he should prevail on that issue, the agreement would be set aside and the matter would still be before the Board as a claim for compensation without any final award having been made.

The judgment is reversed and remanded for a new trial.